UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, <br><br>            Plaintiff, <br><br>    v. <br><br> ALLIED RECYCLING CENTER, INC., <br><br>            Defendant. | Case No. 1:24-cv-12136 <br><br> **COMPLAINT** |

## INTRODUCTION

1. For at least the last five years, Allied Recycling Center, Inc. ("Allied") has discharged polluted industrial stormwater from its 17-acre scrap metal recycling facility at 1901 Main Street, Walpole, Massachusetts (the "Facility") in violation of the federal Clean Water Act. 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or "the Act") and the terms of the stormwater permit ("Stormwater Permit") issued by EPA under the Act.

2. Allied discharges this polluted stormwater through two outfalls into wetlands within the Cedar Swamp wetlands system (the "Cedar Swamp Wetlands"), which are connected to the Neponset River. Allied's own sampling shows that its stormwater discharges contain amounts of lead, zinc, aluminum, copper, chemical oxygen demand ("COD"), and total suspended solids ("TSS") many times higher than benchmark standards established by the United States Environmental Protection Agency ("EPA"). Excessive heavy metals in runoff pose a long-term threat to aquatic ecosystems, the food chain, and human health. Once introduced into the aquatic environment, lead and other heavy metals such as zinc, aluminum, iron, and copper will mix in the

water column, settle into sediments, or be consumed by biota. Heavy metals are readily dissolved in water, making them easily absorbed by aquatic organisms such as fish and invertebrates. Excessive levels of heavy metals in the aquatic environment can disturb organisms' growth, metabolism, and reproduction. High levels of COD, a measurement of organic matter in water, can lower the availability of oxygen in the water and can impair or even asphyxiate aquatic organisms. High TSS levels in water can cause numerous impacts to aquatic species, including blocking light from photosynthesizing plants and destroying habitat.

3.      Allied first failed to seek authorization for its polluted stormwater discharges under the Stormwater Permit as required by the Act. After Allied finally sought coverage under the Stormwater Permit in 2019, Allied failed to control this pollution according to the requirements of the Act and the terms of the Stormwater Permit. Allied's failure to take adequate corrective action to eliminate these excessive pollutant discharges and to otherwise properly control and monitor the quality of its stormwater discharges violates the Clean Water Act and the Stormwater Permit. The Commonwealth of Massachusetts ("Commonwealth") therefore brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Allied's illegal discharges of pollution.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

5.      On July 20, 2022, the Commonwealth provided notice of Allied's violations of the Clean Water Act, and of its intention to file suit against Allied (the "Notice Letter"), to the Administrator of EPA, the Administrator of EPA Region 1, the Commissioner of the

2

Massachusetts Department of Environmental Protection ("MassDEP"), and to Allied as required by the Act at 33 U.S.C. § 1365(b)(1)(A).

6.    More than sixty days have passed since notice was served.

7.    This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

8.    The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Allied's failure to comply with the Clean Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Allied's activities. Allied's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

9.    Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

10.    Plaintiff is the Commonwealth, appearing by and through the Attorney General.

11.    The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

12.    Defendant Allied Recycling Center, Inc. is a domestic corporation with its principal address listed as 1901 Main Street, Walpole, MA 02081.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

13.     The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

14.     Polluted stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, organic matter, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

15.     To minimize polluted stormwater discharges from industrial facilities, EPA has issued Stormwater Permit under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued it in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015); 86 Fed. Reg. 10269 (Feb 19, 2021).[1]

16.     Scrap recycling facilities like Allied that discharge industrial stormwater to waters of the United States are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D-4 (Sector N).

---

[1] This Complaint concerns violations under the 2015 and 2021 revisions. The 2021 revision to the Stormwater Permit ("2021 Stormwater Permit") is substantially similar to the 2015 version ("2015 Stormwater Permit"). Where there is a difference in citations due to numbering, the Complaint provides citations to each of the revisions. Where there is no difference in Section numbering, this Complaint refers to the two versions jointly as the "Stormwater Permit."

17.   The Stormwater Permit requires these facilities to, among other things:

a.   prepare a stormwater pollution prevention plan ("SWPPP") that includes all of the elements required by the Stormwater Permit (2015 Stormwater Permit Sections 5.0, 8.N.4; 2021 Stormwater Permit, Sections 6.0, 8.N.4);

b.   submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit (2015 Stormwater Permit, Section 1.2.1; 2021 Stormwater Permit, Section 1.3.2);

c.   select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges (Section 2.1, 8.N.3);

d.   collect and analyze stormwater samples for compliance with EPA benchmarks that apply to scrap recycling facility, including for COD, TSS, aluminum, copper, lead, and zinc (Section 8.N.7);

e.   report all monitoring data to EPA within mandatory deadlines (Section 7.0);

f.   minimize contact of stormwater runoff with industrial materials, scrap processing equipment, and scrap processing areas (Section 8.N.3.1.2);

g.   keep clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly controlling runoff associated with dumpsters, and keeping exposed areas free of waste, garbage and floatable debris (Section 2.1.2.2);

h.   conduct routine facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and ensure timely corrective actions are taken when they are not (Sections 3.1., 3.2);

i.   comply with any additional inspection requirements applicable to scrap recycling facilities (Section 8.N.5.);

j.   conduct and document corrective action and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit (2015 Stormwater Permit, Section 4.0; 2021 Stormwater Permit, Section 5.0); and

k.   timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions (2015 Stormwater Permit, Section 7.5; 2021 Stormwater Permit, Section 7.4).

*Citizen Suit Provision of the Federal Clean Water Act*

18.     Section 505(a)(1) of the Act authorizes citizen enforcement actions by any "person" against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

19.     The Commonwealth is a "person" having an interest which is or may be adversely affected by violations of NPDES permit requirements and for unpermitted discharges of pollutants. *See* 33 U.S.C. § 1365(g).

20.     Under Section 505 of the Act, this Court has authority to enjoin Allied's violations of the Act's prohibition on unauthorized discharges of pollutants and to require the company to comply with the Stormwater Permit. The Court also has authority to impose penalties of up to $66,712 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. § 19.4; 88 Fed. Reg. 89,309 (Dec. 27, 2023).

**STATEMENT OF FACTS**

**<u>Description of the Allied Facility and Activities Conducted There</u>**

21.     Since 1988, Allied has operated a large scrap metal facility at 1901 Main Street in Walpole, Massachusetts. The Facility includes a yard, office, operations buildings, equipment, and large stockpiles of scrap metals, vehicles, and other materials for recycling.

22.     Allied acquires materials composed of ferrous and non-ferrous scrap metal, and then processes them. Its operations include scrap metal loading, unloading, recycling, processing, and storage, as well as vehicle fueling, dismantling, processing, storage, and maintenance.

23.     Allied stockpiles unprocessed metal, final products, and waste materials ("Industrial Material") at the Facility.

24.     Allied moves Industrial Material around the Facility, dropping it into large piles, in uncovered containers, and onto the ground with vehicles and heavy equipment ("Equipment").

25.     Industrial Material that Allied places or drops on the ground mixes with other sediments on the ground.

26.     The Facility is bordered generally on the east and west by privately owned land, and on portions of the north and by property owned by the Town of Walpole for conservation purposes, with a small area of frontage on route 1A to the southeast.

### Allied's Discharge of Pollutants from the Facility

*Stormwater Discharges to the Cedar Swamp Wetlands*

27.     During every rain or snowmelt event, stormwater flows over Industrial Materials, Equipment, and the ground surface at the Facility.

28.     Between 2015 and September 18, 2019, Allied was not covered by any EPA stormwater general permit and Allied did not have any other authorization to discharge pollutants from the Facility under the Act.

29.     On or about September 18, 2019, Allied submitted a Notice of Intent to be covered by the Stormwater Permit. Allied's NOI designated two outfalls, Outfall 001 and Outfall 002.

30.     Stormwater that flows onto and around the Facility picks up pollutants and flows into the Cedar Swamp Wetlands through Outfalls 1 and 2. The following aerial image, taken from the MassGIS mapping system and annotated by the Attorney General's Office, depicts the approximate locations of the boundaries of the Facility, the adjacent Cedar Swamp Wetlands, and the two outfalls identified by Allied in its NOI.



31.    Since at least July 1, 2017, during the rain events listed on Attachment A, Allied has discharged polluted stormwater off the Facility and into the Cedar Swamp Wetlands via Outfalls 001 and 002.

32.    Allied's stormwater discharges contain a myriad of pollutants including lead, zinc, aluminum, copper, COD, and TSS.

*Excessive Pollutants in Stormwater Discharges into the Cedar Swamp Wetlands*

33.    Allied's monitoring reports consistently show that the presence of pollutants in its stormwater discharges from Outfall 001 and Outfall 002 routinely exceed by large orders of magnitude EPA benchmark limits for lead, zinc, aluminum, copper, COD, and TSS. Failure to take corrective action following persistent benchmark monitoring exceedances constitutes a violation of the Stormwater Permit. *See* Table 1: Benchmark Exceedances Since 2019.

**Table 1: Benchmark Exceedances Since Quarter 4 of 2019**
**Outfall 001**

| Quarter End Date | Parameter | Amount in Sample | EPA Benchmark Value | Percentage Above Benchmark |
|---|---|---|---|---|
| 12/31/2019 | COD | 203 | 120 | 69% |
| | Copper | 0.0202 | 0.009 | 124% |
| 3/31/2020 | Lead | 0.125 | 0.045 | 178% |
| | TSS | 112 | 100 | 12% |
| | Aluminum | 3.6 | 0.75 | 380% |
| | COD | 520 | 120 | 333% |
| | Copper | 0.186 | 0.009 | 1967% |
| | Zinc | 0.379 | 0.08 | 374% |
| 9/30/2020 | Lead | 0.0527 | 0.045 | 17% |
| | Aluminum | 0.757 | 0.75 | 1% |
| | Copper | 0.0658 | 0.009 | 631% |
| | Zinc | 0.198 | 0.08 | 148% |
| 12/31/2020 | Lead | 0.0836 | 0.045 | 86% |
| | Aluminum | 3.23 | 0.75 | 331% |
| | Copper | 0.132 | 0.009 | 1367% |
| | Zinc | 0.338 | 0.08 | 323% |
| 3/31/2021 | COD | 213 | 120 | 78% |
| | Copper | 0.091 | 0.009 | 911% |
| | Zinc | 0.181 | 0.08 | 126% |
| 9/30/2021 | Lead | 0.152 | 0.045 | 238% |
| | TSS | 132 | 100 | 32% |
| | Aluminum | 1.8 | 1.1 | 64% |
| | Copper | 297 | 5.19 | 5623% |
| | Zinc | 0.284 | 0.08 | 255% |
| 12/31/2021 | Lead | 0.046 | 0.045 | 2% |
| | Copper | 42 | 5.19 | 709% |
| | Zinc | 0.175 | 0.08 | 119% |

**Outfall 002**

| Quarter End Date | Parameter | Amount in Sample | EPA Benchmark Value | Percentage Above Benchmark |
|---|---|---|---|---|
| 12/31/2019 | Lead | 0.091 | 0.045 | 102% |
| | Aluminum | 0.964 | 0.75 | 29% |
| | COD | 243 | 120 | 103% |
| | Copper | 0.084 | 0.009 | 833% |
| | Zinc | 0.351 | 0.08 | 339% |
| 3/31/2020 | Lead | 0.381 | 0.045 | 747% |
| | TSS | 168 | 100 | 68% |
| | Aluminum | 9.57 | 0.75 | 1176% |
| | COD | 1090 | 120 | 808% |
| | Copper | 0.4 | 0.009 | 4344% |
| | Zinc | 1.27 | 0.08 | 1488% |
| 9/30/2020 | Lead | 0.0624 | 0.045 | 39% |
| | COD | 341 | 120 | 184% |
| | Copper | 0.0812 | 0.009 | 802% |
| | Zinc | 0.267 | 0.08 | 234% |
| 12/31/2020 | Lead | 0.0851 | 0.045 | 89% |
| | Aluminum | 1.28 | 0.75 | 71% |
| | COD | 402 | 120 | 235% |
| | Copper | 0.132 | 0.009 | 1367% |
| | Zinc | 0.797 | 0.08 | 896% |
| 3/31/2021 | Lead | 0.053 | 0.045 | 18% |
| | Aluminum | 0.836 | 0.75 | 11% |
| | COD | 966 | 120 | 705% |
| | Copper | 0.336 | 0.009 | 3633% |
| | Zinc | 0.757 | 0.08 | 846% |
| 9/30/2021 | Lead | 0.234 | 0.045 | 420% |
| | TSS | 260 | 100 | 160% |
| | Aluminum | 5.66 | 1.1 | 415% |
| | COD | 385 | 120 | 221% |
| | Copper | 262 | 5.19 | 4948% |
| | Zinc | 1.13 | 0.08 | 1313% |
| 12/31/2021 | Lead | 0.279 | 0.045 | 520% |
| | TSS | 306 | 100 | 206% |
| | Aluminum | 4.74 | 1.1 | 331% |
| | COD | 485 | 120 | 304% |
| | Copper | 279 | 5.19 | 5276% |
| | Zinc | 0.986 | 0.08 | 1133% |

*Resources Affected by Allied's Discharges of Polluted Stormwater*

34.    The Cedar Swamp Wetlands drain to the Neponset River. The tributary streams and wetlands within the Neponset River Watershed are important in protecting aquatic resources by acting as a natural filtering system for water quality, by preventing downstream flooding, and by providing natural habitats to native species.

35.    Portions of the Cedar Swamp Wetlands have been designated by the Commonwealth as a "Critical Natural Landscape" associated with Inland Atlantic White Cedar Swamp, which is a rare natural community type in the Commonwealth. It is critical to the lifecycle of Hessel's Hairstreak, a moth species listed by the Commonwealth as of "Special Concern." Due in part to the presence of this natural community type, the Commonwealth has designated portions of the Cedar Swamp Wetlands as "Priority Habitat" and "Estimated Habitat" for Hessel's Hairstreak. According to the Massachusetts Department of Fish & Game, protection of Critical Natural Landscape "is essential to safeguard the diversity of species and their habitats, intact ecosystems, and resilient natural landscapes across Massachusetts."[2]

*Potential Impacts from Pollutants in Allied's Stormwater Discharges*

36.    Lead is commonly used as an additive in the steel making process to improve the machinability of the steel. It may be present in the coatings on scrap metal (paints, hot dips, etc.) or it may be present as pure metal, an alloy, or its oxides. The use of heat in the processing of steel scrap can release substantial amount of lead fume, resulting in the settling of lead dust. Abrasive

---

[2] Massachusetts Department of Fish & Game, Division of Fisheries & Wildlife and The Nature Conservancy, BioMap2: Conserving the Biodiversity of Massachusetts in a Changing World (2010).

removal of surface coatings also creates lead dust. Lead on the surfaces of scrap metal and lead dust from the processing of scrap is picked up in stormwater and can adversely impact water quality. Lead dust also poses a significant threat to human health and safety.  Adverse effects of lead in water on aquatic species occur at very low concentrations and include reduced survival, impaired reproduction, and reduced growth. Even at low levels, lead may cause a range of human health effects, including learning disabilities, kidney problems, and high blood pressure. Children are particularly vulnerable to impacts from lead contamination.

37.     Zinc is used in metal alloys such as brass, nickel silver, and aluminum solder, and is used in metal galvanizing, a process of applying a coating to steel or iron to slow the rate of corrosion. Adverse effects of excessive dissolved zinc among aquatic species include altered behavior, blood and serum chemistry, impaired reproduction, and reduced growth.

38.     Aluminum is the most widely recycled nonferrous metal. Sources of aluminum in a metal scrap yard may include left-over material from industrial processes (e.g., aluminum left over when can lids are punched out of sheets), or aluminum from building siding or fixtures. Elevated levels of aluminum can affect some species' ability to regulate ions, like salts, and inhibit respiratory functions, like breathing. Aluminum can accumulate on the surface of a fish's gill, leading to respiratory dysfunction, and possibly death.

39.     Copper is used in a variety of applications such as pipes, electrical components, and electric wires. The storage and processing of these components can lead to contamination of stormwater runoff at scrap yard facilities. The melding or grinding of copper metal may increase the presence of copper dust. Copper in at high concentrations has a negative impact on fish and wildlife and may impact predator avoidance behaviors, growth, and migration.

40.     COD is a measurement of organic matter in water. Excessive discharges of organic matter pose a risk of harm to water quality and aquatic life. When high levels of organic matter are discharged to a waterbody, the presence of bacteria, fungi, and other decomposer organisms increases. The presence of decomposer organisms and the decomposition process lowers the available oxygen in the water, impairing other aquatic organisms or, in severe cases, asphyxiating them.

41.     TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Solids in scrap yard stormwater discharges are likely to include non-dissolved metal particles and contaminated soil. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations. In addition, other pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to sediment and can significantly impact water quality when carried by stormwater to rivers and other waterbodies.

## Allied's Violations of the Stormwater Permit

42.     Between July 20, 2017, and September 18, 2019, Allied failed to submit any Notice of Intent to be covered by the Stormwater Permit.

13

43.    Between July 20, 2017, and September 18, 2019, Allied also failed to comply with

the terms of the Stormwater Permit by failing to do the following:

a.   prepare a SWPPP for the Facility (violation of 2015 Stormwater Permit, Section 5.0; 2021 Stormwater Permit, Section 6.0);

b.   submit an NOI for the Facility (violation of 2015 Stormwater Permit, Section 1.2.1; 2021 Stormwater Permit, Section 1.3.2);

c.   select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges (violation of Stormwater Permit, Sections 2.0, 8.N.3);

d.   collect and analyze stormwater samples for compliance with EPA benchmarks that apply to scrap recycling facilities (violation of 2015 Stormwater Permit, Section 6.2.1; 2021 Stormwater Permit, Section 4.2.2);

e.   report all benchmark monitoring data to EPA within mandatory deadlines (violation of Stormwater Permit, Section 7.0);

f.   conduct and document corrective actions and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit (violation of 2021 Stormwater Permit, Section 4.0; 2015 Stormwater Permit, Section 5.0);

g.   conduct routine Facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the Facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharges, and ensure timely corrective actions are taken when they are not (violation of Stormwater Permit, Sections 3.1, 3.2, and 8.N.5); and

h.   timely prepare and submit to EPA annual reports that include findings from the Facility inspections and visual assessments and documentation of corrective actions (violation of 2015 Stormwater Permit, Section 7.5; 2021 Stormwater Permit, Section 7.4).

44.    Since at least February 14, 2020, Allied has continued to violate the Stormwater

Permit by failing to conduct and document corrective action to expeditiously eliminate excessive

stormwater pollution, as shown by the fact that the average of four quarterly sampling results

exceeded the applicable benchmarks as of that date (violation of Stormwater Permit, Sections 2.1

and 4).

14

45.     Since at least September 18, 2019, Allied has continued to violate the Stormwater Permit by also failing to do the following:

a.     minimize contact of stormwater runoff with Industrial Materials, scrap processing equipment, and scrap processing areas (violation of Section 8.N.3.1.2);

b.     keep clean all exposed areas that are potential sources of pollutants by storing materials in appropriate containers, properly control runoff associated with dumpsters, and keep exposed areas free of waste, garbage, and floatable debris (violation of Section 2.1.2.2); and

c.     appropriately conduct routine and quarterly facility inspections to ensure, among other things, that control measures are functioning correctly and are adequate to minimize pollutant discharges and to ensure that corrective actions are timely performed when necessary (violation of Stormwater Permit, Sections 3.1, 3.2, and 8.N.5).

## FIRST CAUSE OF ACTION

**Discharge Without a Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C.**
**§ 1311(a)**

46.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

47.     Allied is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

48.     The Cedar Swamp Wetlands are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

49.     By discharging industrial stormwater from the Facility into the Cedar Swamp Wetlands without a Stormwater Permit, Allied violated Section 301(a) of the Act, 33 U.S.C. § 1311(a).

50.    Each day between July 20, 2017, and September 18, 2019, that Allied discharged industrial stormwater from the Facility into the Cedar Swamp Wetlands without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. See also Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

51.    These violations establish an ongoing pattern of failure to comply with the Act's requirements.

## SECOND CAUSE OF ACTION

### Noncompliance with the Federal Stormwater Permit Prior to 2019 NOI: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

52.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

53.    Allied violated the Stormwater Permit between at least July 20, 2017, and September 18, 2019, by failing to comply with its terms as set forth in paragraph 43.

54.    Each of Allied's violations of each of the requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

55.    These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## THIRD CAUSE OF ACTION

### Noncompliance with the Federal Stormwater Permit After 2019 NOI:
### Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C.
### § 1311(a)

56.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

57.    Allied has violated the Stormwater Permit since at least February 14, 2020, by failing to comply with its terms as set forth in paragraphs 44.

58.    Allied has violated the Stormwater Permit since at least September 18, 2019, by failing to comply with its terms as set forth in paragraphs 45.

59.    Each of Allied's violations of each of the requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

60.    These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

### RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1.    Require Allied to comply with EPA's federal Stormwater Permit;

2.    Order Allied to pay civil penalties of up to $66,712 per day for each of the company's prior violations.

3.    Order Allied to take appropriate actions to restore the quality of protected areas impaired by its activities;

4.      Award the Commonwealth's costs (including reasonable investigative, attorney,

witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.      Award any such other and further relief as this Court may deem appropriate.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

Louis M. Dundin (BBO#660359)
Assistant Attorney General
Deputy Division Chief
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 963-2433
Louis.Dundin@mass.gov

Dated: August 10, 2024

# Exhibit A
## (Allied Facility Stormwater Discharge Dates)

DAYS BETWEEN JULY 1, 2017, AND AUGUST 10, 2024, ON WHICH STORMWATER FROM FACILITY DISCHARGED INTO WATERS OF THE UNITED STATES

| Year | Month | Date |
|---|---|---|
| 2017 | July | 7, 18, 24 |
| | August | 2 |
| | September | 6, 7, 15, 20, 22, 30 |
| | October | 24, 25, 26, 29, 30 |
| | November | 22 |
| | December | 6, 9, 23, 25 |
| 2018 | January | 4, 12, 13, 23 |
| | February | 4, 7, 11, 25 |
| | March | 2, 7, 13 |
| | April | 3, 16, 25, 27 |
| | May | 15 |
| | June | 4, 28 |
| | July | 6, 11, 17, 26 |
| | August | 3, 4, 8, 11, 22 |
| | September | 6, 10, 11, 13, 18, 25, 26, 28 |
| | October | 2, 3, 11, 27 |
| | November | 15, 16, 20, 25, 26, 27 |
| | December | 2, 16, 21, 28, 31 |
| 2019 | January | 1, 5, 20, 24 |
| | February | 6, 13, 24 |
| | March | 10, 22 |
| | April | 3, 8, 13, 15, 22, 26, 27 |
| | May | 12, 13, 20, 23, 30 |
| | June | 11, 21 |
| | July | 6, 12, 17, 22, 23, 31 |
| | August | 7, 8, 28 |
| | September | 2 |
| | October | 2, 11, 16, 17, 27 |
| | November | 5, 18, 24 |
| | December | 2, 14, 30 |
| 2020 | January | 25 |
| | February | 6, 7, 13, 18, 27 |
| | March | 13, 19, 23, 24, 29 |
| | April | 3, 9, 13, 18, 21, 27 |
| | May | 1, 8, 15 |
| | June | 6, 28, 29 |
| | July | 5, 23 |
| | August | 22, 23, 27 |
| | September | 10, 30 |
| | October | 29, 30 |
| | November | 1, 15, 23, 26, 30 |
| | December | 1, 5, 12, 17, 25 |
| 2021 | January | 16 |
| | February | 1, 2, 7, 16, 19 |
| | March | 18, 28, 31 |
| | April | 1, 16, 21, 29 |
| | May | 4, 5, 10, 28, 29, 30 |
| | June | 12, 14, 22, 30 |
| | July | 1, 2, 3, 7, 8, 9, 12, 17 |
| | August | 4, 5, 19, 22, 23 |
| | September | 1, 2, 9, 26, 28 |

|      | October   | 4, 25, 26, 30, 31 |
|------|-----------|-------------------|
|      | November  | 12 |
|      | December  | 18, 19 |
| 2022 | January   | 7, 17 |
|      | February  | 4, 7, 8, 18, 22, 25 |
|      | March     | 12, 24, 25, 31 |
|      | April     | 1, 16, 19 |
|      | May       | 28, 31 |
|      | June      | 9, 27 |
|      | July      | - |
|      | August    | 22, 26 |
|      | September | 5, 6, 22 |
|      | October   | 4, 5, 13, 14, 24 |
|      | November  | 11, 16, 27, 30 |
|      | December  | 7, 16, 23 |
| 2023 | January   | 13.19. 20, 23, 26 |
|      | February  | 23 |
|      | March     | 4, 14 |
|      | April     | 23, 30 |
|      | May       | 20 |
|      | June      | 2, 17 |
|      | July      | 4, 10, 16, 21, 25, 29 |
|      | August    | 8, 15, 18, 21, 25 |
|      | September | 11, 13, 18, 24, 29 |
|      | October   | 21 |
|      | November  | 22 |
|      | December  | 3, 10, 11, 17, 18, 28 |
| 2024 | January   | 7, 9, 10, 13, 26, 28 |
|      | February  | - |
|      | March     | 2, 7, 10, 23, 25, 28, 29 |
|      | April     | 3, 4, 12 |
|      | May       | 8 16, 23, 26, 30 |
|      | June      | 14, 21, 26 |
|      | July      | 13 |
|      | August    | - |